## State of Vermont v. Gregory S. Forty

[989 A.2d 509]

No. 08-434

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 25, 2009

_____

*Deborah A. Celis*, Franklin County Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, *Rebecca Turner*, Appellate Defender, and *Jeffrey Rubin*, Law Clerk, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Following a jury trial in Franklin District Court, defendant was convicted of two counts of first-degree aggravated domestic assault. On appeal, defendant contends that the trial court committed reversible error by (1) issuing improper jury instructions regarding defendant's alibi defense, (2) prohibiting a line of questioning concerning an alleged prior incident of abuse of victim, (3) excluding one of defendant's lay witnesses for violating the court's sequestration order, and (4) excluding defendant's expert witness. We conclude that the trial court did not commit reversible error and affirm.

¶ 2. Both parties agree that during December 2007 victim lived at defendant's dairy farm in Franklin, Vermont. On the evening of December 30, victim and defendant received a visit from four friends. The group drank alcohol and socialized at defendant's house until defendant and victim got into a heated argument and defendant demanded that victim move out. Defendant and the four visitors then left for the house of one of the friends, which was a relatively short distance away, leaving victim by herself in defendant's house. It is at this point that the parties' stories diverge.

¶ 3. The State alleged the following facts: Shortly after the group left, victim too went to the friend's house to confront defendant and find out if he truly wanted her to move out. Defendant ignored her attempts to speak with him, and so she left the friend's house for the residence of her former boyfriend. Defendant followed victim to the former boyfriend's residence. When victim went onto the porch to speak to him, defendant grabbed her and pulled her over the porch railing and onto the ground, and began punching her repeatedly. After the beating, defendant told victim that he would be back to burn down the house with her inside, and he left.

¶ 4. Victim, fearing for her safety, returned to the friend's house, reasoning that the group of friends at this house would

protect her from defendant. When she arrived, only two of the friends remained at the house. After the owner of the house retired to his bedroom, leaving victim and one friend alone together in the living room, defendant arrived. Again, defendant began physically abusing victim. He threw her off the couch, hit her, and kicked her in the face, all in the presence of the friend. Victim begged defendant to stop and pleaded for the friend to help her. After defendant kicked victim in the face, the friend finally said, "you got the bitch good," and defendant stopped the attack.

¶ 5. Victim fled, this time for defendant's farmhouse, and was again pursued by defendant. Victim decided that, upon arriving at the farmhouse, she would pretend that everything was okay, in the hope that defendant finally would leave her alone. As she parked, defendant blocked her car in the driveway. He got out of his truck and subsequently apologized to victim. Victim feigned forgiveness, and suggested that defendant move his truck so that it no longer blocked her in. As defendant went to move the truck, victim called 911. In the midst of the call, defendant entered the house, causing victim to promptly hang up. Defendant told victim that if she had called 911, he would "put a bullet in her head." Just then, the phone rang. Defendant answered the phone and briefly spoke to the 911 operator. Taking advantage of the distraction, victim fled. While on the road, she saw a police officer and stopped for help. Victim described the assaults to the officer and was taken to the hospital for her injuries.

¶ 6. Defendant offers a starkly different account of the events that unfolded after defendant and his friends first arrived at the friend's house. He alleges that shortly after the group settled in at the house, victim barged in, demanded beer, and confronted defendant, asking if he was serious about requesting her to move out. She then attacked defendant, pulling his hair and beard, and scratching his face, as he sat at the dining table. After filling her pockets with cans of beer, victim left.

¶ 7. Victim returned to the friend's household a second time around 11:00 p.m. This time, she demanded beer and money. Defendant, who had not left the friend's residence at any point since first arriving, told victim to leave. Victim did so without incident. Defendant spent the night at the friend's house and returned home in the morning. Defendant acknowledged, as he had to, that the 911 operator called his house in response to

victim's 911 call. He claimed, however, that since he was not at his house when the call came in, some other male answered the telephone.

¶ 8. Defendant was charged in Franklin District Court with four counts of aggravated domestic assault. Counts one and two charged him with aggravated domestic assault of victim at, respectively, the former-boyfriend's residence and the friend's residence. For these counts, the State alleged that defendant attempted to cause "serious bodily injury to a household member" in violation of 13 V.S.A. § 1043(a)(1). Count three also charged defendant with aggravated domestic assault at the former boy-friend's residence. For this count, defendant was charged with recklessly causing bodily injury to victim, having been previously convicted of aggravated domestic assault, in violation of 13 V.S.A. § 1043(a)(3). Count four was similar to count three, and also charged a violation of § 1043(a)(3) because defendant had previously been convicted of aggravated domestic assault, but alleged that at defendant's residence he had willfully caused victim "to fear imminent serious bodily injury."

¶ 9. At trial, the friends all testified in support of defendant's version of the events. The State's case was based generally on the testimony of victim. An eyewitness to the events at the house of the ex-boyfriend also testified. While the eyewitness observed an assault on victim, the description of the perpetrator did not entirely fit defendant.

¶ 10. The jury acquitted defendant on counts one and three, both of which stemmed from the alleged incident at the former boyfriend's residence. The jury convicted defendant on count two, which encompassed the alleged attack at the friend's house, and count four, which encompassed the alleged threats made to victim at defendant's house after she placed the 911 call. At trial, defendant defended count two by arguing that the assault at the friend's residence never occurred. Defendant used an alibi defense to combat count four, arguing that he was at the friend's residence all night and therefore could not have been at his own farmhouse to answer the 911 callback.

¶ 11. Defendant appeals his convictions on counts two and four, contending that the trial court erred in: (1) failing to instruct the jury that the State must disprove defendant's alibi beyond a reasonable doubt and giving an improper false alibi instruction to the jury; (2) precluding defendant from cross-examining victim

about an alleged assault by a third party; (3) preventing defendant from calling a particular lay witness to identify the voice on the 911 callback tape; and (4) denying defendant's expert witness the opportunity to testify. We address each of these arguments in turn.

¶ 12. We begin with the jury instructions. Defendant advances several lines of attack on the trial court's jury instructions. First, defendant argues that the trial court erred when it declined to specifically instruct the jury that the State bore the burden of disproving defendant's alibi beyond a reasonable doubt. Defendant contends that without such an instruction the jury might have incorrectly believed that a defendant who raises an alibi defense bears the burden of proving that defense beyond a reasonable doubt, and any instruction that relieves the State of its burden of proving a defendant's guilt beyond a reasonable doubt denies due process of law.

¶ 13. It is true that a jury instruction that implies a burden shift from the State to a criminal defendant denies due process of law in violation of the Fourteenth Amendment to the United States Constitution. *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979); *Patterson v. New York*, 432 U.S. 197, 215 (1977); *State v. Ovitt*, 148 Vt. 398, 402, 535 A.2d 1272, 1274 (1986). We do not believe, however, that the trial court's alibi instructions in the present case shifted the burden of proof away from the State. The trial court instructed the jury as follows:

> Evidence has been introduced tending to show that the Defendant was not present at the time and place where the State alleges he committed the several offenses. It is, of course, the State's burden to prove beyond a reasonable doubt each of the essential elements of each offense, including the identity of Gregory Forty as the person who committed each offense on the date and at the place alleged. If, after considering all of the evidence, you have a reasonable doubt that the Defendant was present at the time and place where it is alleged the offense was committed, then you must find him not guilty of that offense.
>
> However, if you find beyond a reasonable doubt that the alibi is false or fictitious, and that the Defendant was, in fact, at the place when and where the crime was

committed, then the attempt to establish an alibi is evidence of guilt to be established by you along with all of the other evidence in this case.

The instructions make clear that it is the State's duty "to prove beyond a reasonable doubt each of the essential elements of each offense, *including the identity* of Gregory Forty as the person who committed each offense on the date and at the place alleged." (emphasis added). In proving the identity of an assailant, the State must necessarily disprove that the defendant was elsewhere. When the State cannot disprove that the defendant was elsewhere at the time of an assault, there remains at least some reasonable doubt that it was the defendant who committed the assault. And indeed, the trial court's instructions explain as much to the jury, reminding them, "[i]f, after considering all of the evidence, you have a reasonable doubt that the Defendant was present at the time and place where it is alleged the offense was committed, then you must find him not guilty of that offense." While the court may not have used the precise language that defendant sought, it gave defendant's request in substance.

¶ 14. It is instructive that the trial court's jury charge on defendant's alibi tracks nearly word-for-word jury instructions that this Court endorsed in *State v. Ovitt.*[1] 148 Vt. at 401-02, 403, 535 A.2d at 1273-74, 1275. In *Ovitt*, a defendant introduced evidence that he was milking cows a quarter of a mile away from the victim at the time a lewd and lascivious act was alleged to

---

[1] The *Ovitt* trial court's jury instructions read:

> Now, evidence in this case has also been introduced tending to establish that an alibi was asserted and established, in other words, that the Defendant was not present at the time when or at the place where he was alleged to have committed the offense charged in the Information. It is, of course, the State's burden to establish beyond a reasonable doubt each of the essential elements of the offense, including the involvement of the Defendant. And, if, after consideration of all the evidence in this case, you have a doubt as to whether the Defendant was present at the time and place as alleged in the Information, then you must find him not guilty. However, if you find beyond a reasonable doubt that the alibi is false or fabricated or fictitious and that the Defendant was, in fact, at the place when and where the crime was committed, then the attempt to establish an alibi is evidence of guilt to be considered by you along with all the other evidence in this case.

*Ovitt*, 148 Vt. at 401-02, 535 A.2d at 1273-74.

have occurred. After the defendant challenged the trial court's alibi instructions, this Court affirmed, finding that the charge given by the court "included a thorough instruction on the State's obligation to prove guilt beyond a reasonable doubt, as well as an instruction to find defendant not guilty if, after considering all the evidence, the jury had a reasonable doubt as to defendant's presence at the time and place of the incident." *Id.* at 403, 535 A.2d at 1275. *Ovitt* thus supports the State's argument that defendant's proposed language was unnecessary.

¶ 15. Defendant also contends that the trial court erred in instructing the jury: "if you find beyond a reasonable doubt that the alibi is false or fictitious, and that the Defendant was, in fact, at the place when and where the crime was committed, then the attempt to establish an alibi is evidence of guilt to be established by you along with all of the other evidence in the case." Defendant argues that this instruction relieved the State of its burden of proof and was unwarranted given the evidence in the record. We disagree.

■ ¶ 16. The instruction does not shift the burden of proof. In order for the jury to consider the attempt to establish an alibi evidence of guilt, it must first "find beyond a reasonable doubt that the alibi is *false* or *fictitious*" (emphasis added) — that is, the State must affirmatively disprove the alibi beyond a reasonable doubt. A mere failure to establish an alibi cannot be taken as evidence of guilt under this instruction. This instruction, however, mentions nothing about a *failed* attempt to establish an alibi. Rather, it addresses a permissible consequence of the State proving that an alibi is false or fictitious. Again, we note that the exact language used here was also used in *Ovitt*.

■ ¶ 17. Defendant also contends that the instructions' charge that the jury should view the attempt to establish a false or fictitious alibi as "evidence of guilt" misleads in that it suggests that the jury must find defendant guilty under such a circumstance. Defendant argues that the instructions should have included the qualification that the jury should view a false or fictitious alibi as "some evidence of guilt," or "evidence, but not conclusive evidence" of guilt. We do not reach the merits of this argument. In order to preserve a claim of error in the jury instructions, a party must object "thereto before the jury retires to consider its verdict." V.R.Cr.P. 30. Defendant did preserve the

two claims of error noted above, but did not preserve this alleged error by an objection at trial. In the absence of such an objection, defendant cannot raise the alleged error in this Court for the first time.

¶ 18. Defendant additionally contends that the jury instruction regarding a false or fictitious alibi was not warranted by the evidence. We disagree. In this case, there was evidence to support the inference that defendant's alibi was fictitious: each of defendant's alibi witnesses admitted to reading victim's deposition prior to the trial; some also admitted to reading statements taken from other witnesses prior to the trial; and the alibi witnesses gave varying versions of the events that unfolded on the evening of December 30 through the early morning of December 31. And more directly to the point, there were direct contradictions between the testimony of victim and that of some of defendant's alibi witnesses. If the jury disbelieved the alibi witnesses, it could have concluded that the alibi evidence was falsely created to exonerate defendant. The purpose of the instruction was to point out to the jury that it could use such a conclusion as evidence of guilt. Thus, we find no error in including the jury instruction regarding a false or fictitious alibi.

¶ 19. Next, defendant contends that the trial court erred in barring the cross-examination of victim regarding her condition in November 2007, when she picked up her children from their paternal grandfather. Defendant apparently had two purposes for the evidence: (1) to show she had been physically abused in the past by someone other than defendant as proof that she may have been physically abused by another person during the night in issue, and (2) to impeach victim's credibility to undermine her identification of defendant as the perpetrator of the physical abuse. Defendant relies upon the second ground in this Court.

¶ 20. The issue first arose when defendant indicated that he intended to call the grandfather to testify that when victim appeared to pick up the children she had bruises on her face that indicated she had been beaten and that he believed that she lied to him by stating that she had been injured in a barn accident. At that time, the out of court record indicated that victim had stated that defendant had never physically assaulted her in the past, the grandfather had given a statement to the police consistent with his proposed testimony, and victim had given a statement to the

police that she had no bruises on the day that she picked up the children from the grandfather. At the start of trial, defendant filed a motion in limine arguing both theories for admissibility described above.

■ ¶ 21. The court denied the motion in limine and ruled that the grandfather's testimony was inadmissible. As the court described in its ruling with respect to defendant's motion for a new trial, the testimony was inadmissible to impeach victim because Vermont Rule of Evidence 608(b) prohibits an attack on credibility through extrinsic evidence. See, e.g., *State v. Johnson*, 2008 VT 135, ¶ 19, 185 Vt. 575, 967 A.2d 1174 (mem.). The court found it inadmissible as evidence of an alternative perpetrator because the grandfather was not qualified to testify as to the source of victim's bruises, defendant could not identify an alternative perpetrator and show that he was connected to the crime, and the testimony would have invited speculation about the source of the bruises such as to outweigh the limited probative value under V.R.E. 403. Defendant has not appealed this ruling.

¶ 22. The issue arose again during defense counsel's cross-examination of victim. Defense counsel began to ask about her pick-up of the children at the grandfather's house in November of 2007, and the prosecution objected. The court requested an offer of proof, and defense counsel argued that the evidence to be elicited in the cross-examination was admissible to show that someone else was beating up victim and could have done so on the night in issue. The court excluded the cross-examination, finding it speculative that victim had bruises in November of 2007 or, if she had bruises, that they were caused by a beating.

■ ¶ 23. In this Court, defendant argues that the cross-examination was admissible to challenge the credibility of victim and show that she was covering up for someone else who was beating her. Defendant asserts that the trial court's decision to prohibit this line of questioning violated both the Sixth Amendment to the United States Constitution and Article 10 of the Vermont Constitution by denying him the right to confront adverse witnesses.[2] Our first response is that the argument as presented here was not preserved. An objection on one ground

---

[2] Because defendant does not distinguish how our analysis under Article 10 of the Vermont Constitution should differ from an analysis under the U.S. Constitution's

does not preserve a challenge to admission of the evidence on a different ground. *State v. Lettieri*, 149 Vt. 340, 344, 543 A.2d 683, 685 (1988). This preservation principle applies equally to an offer of proof because in both instances the trial judge never had the opportunity to rule upon the defendant's evidentiary argument. See *State v. Velez*, 551 A.2d 421, 425 (Conn. App. Ct. 1988); *State v. Ramsey*, 692 N.W.2d 498, 508 (N.D. 2005). Defense counsel's claim of admissibility, as stated at the time of the prosecution's objection, rested entirely on the theory that victim's testimony was relevant to show a different perpetrator. Defense counsel never argued that the cross-examination would impeach victim's testimony or that defendant was exercising his Confrontation Clause right.

■ ■ ¶ 24. In any event, we do not find error in the exclusion of the cross-examination if we assume that its purpose was to impeach victim. In reaching this conclusion, we agree that the Sixth Amendment to the United States Constitution guarantees the right of a criminal defendant "to be confronted with the witnesses against him," U.S. Const. amend. VI, and that the Confrontation Clause has been incorporated to apply to state proceedings via the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The Clause includes not only the right to cross-examine adverse witnesses, *id.* at 404, but also entitles a criminal defendant "wide latitude . . . on cross-examination for the purpose of showing who and what the witness is, and that he is unreliable, prejudiced, or biased." *State v. Berard*, 132 Vt. 138, 147, 315 A.2d 501, 508 (1974) (citation omitted). Yet the Clause's protections are not boundless. *State v. Fuller*, 168 Vt. 396, 403-04, 721 A.2d 475, 481 (1998); *State v. Corliss*, 168 Vt. 333, 337, 721 A.2d 438, 441-42 (1998). It gives the defendant " 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *State v. Brochu*, 2008 VT 21, ¶ 87, 183 Vt. 269, 949 A.2d 1035 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). In particular, the Clause applies only to evidence that is relevant and otherwise admissible under the rules of evidence. See *Fuller*, 168 Vt. at 403-04, 721 A.2d at 481; *Corliss*, 168 Vt. at 337, 721 A.2d at 441. In general, exclusion of evidence that is not admis-

Confrontation Clause, we decline to interpret the State Constitution in this case. See *State v. Raymond*, 148 Vt. 617, 619 n.1, 538 A.2d 164, 165 n.1 (1987).

sible does not violate the Sixth Amendment. *Fuller*, 168 Vt. at 403, 721 A.2d at 481; *Corliss*, 168 Vt. at 337, 721 A.2d at 441. Therefore, we are faced with the threshold question of whether defendant sought to introduce admissible evidence.

■ ¶ 25. The court may, in its discretion, admit evidence of specific instances of conduct through cross-examination to attack the witness's credibility. See V.R.E. 608(b). Even though the court was considering a different theory of admissibility, its ruling shows how it exercised its discretion and would have ruled in response to an impeachment argument. The court ruled that it was speculation as to whether victim had been assaulted in November 2007 and, if so, who might have assaulted her. In view of the speculative nature of this evidence, the court ruled that the very limited probative value was substantially outweighed by the likely prejudicial effect and excluded it under V.R.E. 403.

■ ■ ¶ 26. This reasoning also applies to the attempt to use the cross-examination on this point to impeach victim. Because the court excluded the testimony of the grandfather, an exclusion defendant has not challenged on appeal, there was no foundation for the cross-examination. The jury did not know that the grandfather had given a statement that victim had been bruised and lied to the grandfather about the cause of the bruising. Further, victim's statement to the police indicated that she would deny that she had been bruised at all. Thus, the only response defense counsel's questioning was likely to produce was a denial in response to an unsubstantiated accusation. It was clearly within the discretion of the court to exclude the questioning on the basis that it invited the jury to speculate that there was something behind the accusation, with no basis for the speculation. In short, the questions were likely to produce no evidence of probative value but to create a substantial risk of prejudice. See *State v. Larose*, 150 Vt. 363, 368-69, 554 A.2d 227, 231 (1988) (in case charging defendant with assaulting police officer to resist arrest, defendant sought to cross-examine another officer, who was a witness, under V.R.E. 608 on prior accusations of police brutality against him; trial court's exclusion of cross-examination under V.R.E. 403 affirmed as within discretion in part because accusations invited jury to speculate whether accusations were true). The court has wide discretion in making a Rule 403 ruling, and we may overturn that ruling only for abuse of discretion. See *Trotier*

*v. Bassett*, 174 Vt. 520, 523, 811 A.2d 166, 170 (2002) (mem.); *Keus v. Brooks Drug, Inc.*, 163 Vt. 1, 4, 652 A.2d 475, 478 (1994). We find no abuse here.

¶ 27. Defendant next argues that the trial court erred in prohibiting one of his lay witnesses from testifying. Near the beginning of the trial, the State requested that the court issue a sequestration order that barred witnesses from being present during the trial until they had finished testifying. The court granted the order and requested that the attorneys monitor compliance with the order. On the trial's final day, defendant sought to call a lay witness to testify that the voice on the 911 callback recording did not belong to defendant. The judge observed that the witness had been in the courtroom in violation of the sequestration order and therefore did not permit the witness to testify. Defendant contends that the sequestration order was "arbitrary and disproportionate" to the purposes underlying V.R.E. 615, which governs sequestration orders. We disagree.

¶ 28. V.R.E. 615 states that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." The rule seeks to protect against "deliberate witness collusion or unintended suggestion," and thus is limited to permit a witness's exclusion only until the witness has testified. Reporter's Notes, V.R.E. 615. In the instant case, the State requested the sequestration order, and the court issued the order in accordance with the rule. Defendant then had the responsibility of ensuring that his witnesses complied with the court's sequestration order. He failed to do so. The excluded witness was present in the courtroom during the trial, giving her the opportunity to hear other witnesses' testimony prior to being called to testify. Had she been permitted to testify, the barred witness's testimony could have been influenced by what she had observed in the courtroom prior to taking the stand. For instance, the witness had the opportunity to hear victim's testimony that defendant was present at the time victim placed the 911 call and that he threatened to kill her for placing the call. Such knowledge directly relates to the subject-matter of the barred witness's testimony — whether the voice on the 911 callback belonged to defendant — and could have influenced such testimony. Therefore, the exclusion of the witness's testimony fell within both the underlying purpose and the text of V.R.E. 615 and was not an abuse of discretion.

¶ 29. Last, defendant argues that the trial court erred in excluding its expert in the field of voice print analysis from testifying. Although we have some concerns as to the trial court's V.R.E. 702 analysis, we find that the trial court did not abuse its discretion in excluding the expert.

¶ 30. V.R.E. 702 addresses who may testify to an opinion as an expert witness. Witnesses who are "qualified as an expert by knowledge, skill, experience, training, or education, may testify . . . in the form of an opinion or otherwise" if such testimony will be helpful to the trier of fact and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." V.R.E. 702. Rule 702 requires trial courts to act as "gatekeepers who screen expert testimony ensuring that it is reliable and helpful to the issue at hand before the jury hears it." *USGen New Eng., Inc. v. Town of Rockingham*, 2004 VT 90, ¶ 19, 177 Vt. 193, 862 A.2d 269. In other words, trial courts must ensure that expert testimony is both reliable and relevant.

¶ 31. Rule 702 adopts the reliability framework set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). We had adopted and applied this framework by decision even prior to including it within Rule 702. See *985 Assocs., Ltd. v. Daewoo Elecs. Am., Inc.*, 2008 VT 14, ¶ 6, 183 Vt. 208, 945 A.2d 381; *USGen*, 2004 VT 90, ¶ 18; *State v. Streich*, 163 Vt. 331, 343, 658 A.2d 38, 47 (1995). The *Daubert* framework provides trial courts with a nonexhaustive list of four factors to consider in assessing whether proffered scientific evidence is reliable: (1) whether the technique involved can be tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error associated with the technique; and (4) whether the technique has been generally accepted in the scientific community. *USGen*, 2004 VT 90, ¶ 16. The Rule 702 analysis is flexible, however, and a trial court is not limited to consideration of the enumerated factors in determining whether to admit the evidence. *In re JAM Golf, LLC*, 2008 VT 110, ¶ 8, 185 Vt. 201, 969 A.2d 47; *USGen*, 2004 VT 90, ¶ 16.

¶ 32. On May 23, 2008, defendant filed a motion to admit the testimony of its expert witness, Stephen Cain, a forensic scientist

in the field of voice print analysis. Voice print analysis is a process in which two voice samples are compared to determine whether the voices belong to the same person. M. McCarthy, Annotation, *Admissibility and Weight of Voice Spectrographic Analysis Evidence*, 95 A.L.R.5th 471, § 2[a] (2002). Mr. Cain analyzed the voice sample taken from the 911 callback and compared it against a sample taken from defendant using a voice sonograph. Defendant sought to have Mr. Cain give a "qualified" opinion at the trial as to the dissimilarity between the voices on the two samples. In response to the motion, the trial court scheduled a hearing to evaluate whether to allow Mr. Cain to provide this opinion.

¶ 33. At the hearing, Mr. Cain testified that voice print analysis is based on scientific knowledge and is reliable. For instance, he testified that the forensic techniques that he uses are capable of being tested and indeed have been tested in three formal studies. Moreover, Mr. Cain stated that his techniques have been, and continue to be, subjected to peer review in scientific periodicals such as *The Forensic Examiner* and at professional conferences. Mr. Cain also testified that voice print analysis has an error rate ranging between one and two percent. Last, Mr. Cain testified that voice print analysis is accepted within the forensic scientific community.

¶ 34. The State did not offer its own expert, nor did it introduce any evidence to challenge Mr. Cain's testimony that the techniques he practices are testable, have been subjected to peer review, have a low error rate, and are accepted within the forensic scientific community. Instead, the State challenged whether Mr. Cain had sufficient data to enable him to draw a reliable conclusion. On cross-examination, Mr. Cain testified that he could not render one of the seven definitive opinions sanctioned by the American Board of Recorded Evidence because the 911-callback tape included only eight words that he could use for comparison. Board's standards require at least ten words to issue a definitive opinion. Mr. Cain testified that he could issue only a "qualified" opinion that the voices on the two tapes are dissimilar and, moreover, that he was hesitant to issue this kind of opinion. The State contended that the qualified opinion was inaccurate and unreliable because it did not conform to the voice comparison minimum standards which require at least ten words.

¶ 35. The trial court concluded that defendant failed to make the threshold showing of reliability required by V.R.E. 702 and denied

defendant's motion to admit Mr. Cain's expert witness testimony. Relying on the evidentiary findings of the courts in *United States v. Angleton*, 269 F. Supp. 2d 892 (S.D. Tex. 2003), *State v. Coon*, 974 P.2d 386 (Alaska 1999), and *People v. Collins*, 405 N.Y.S.2d 365 (Sup. Ct. 1978), the trial court concluded that proponents of voice print analysis techniques generally (1) have not yet adequately addressed whether the theories or methods underlying voice print analysis are capable of being tested, (2) have not yet established that voice print analysis techniques have been sufficiently subjected to peer review and publication, (3) have failed to show that the field of voice print analysis has a known or potential rate of error, and (4) have not demonstrated that voice print analysis has gained general acceptance in the relevant scientific community. Furthermore, the trial court concluded that Mr. Cain's inability to give an "ultimate conclusion" due to the lack of sufficient data was a fatal deficiency to the admission of his expert testimony.

¶ 36. We affirm on the second ground for the trial court decision to exclude the expert testimony. The standard of review for admissibility decisions under V.R.E. 702 is abuse of discretion. *USGen*, 2004 VT 90, ¶ 24. We find no abuse here.

 ¶ 37. Mr. Cain testified that he was unable to give one of the seven American Board of Recorded Evidence sanctioned opinions due to insufficiency of data. See *Angleton*, 269 F. Supp. 2d at 894 n.2 (setting forth the possible opinions and the requirements to render them). Because he had just eight words to work with, he could issue only a qualified opinion that the voices on the two tapes are dissimilar. In Mr. Cain's words, the data allowed him to "attempt[] to at least let [defendant's] attorney know as to whether or not those words were dissimilar or similar." Mr. Cain admitted that he was hesitant to issue this kind of opinion. Taken as a whole, the trial court had sufficient evidence on the record to conclude that Mr. Cain did not have enough data to render a reliable opinion. Therefore, on this basis we conclude that the trial court did not abuse its discretion in denying defendant's motion to admit Mr. Cain's expert witness testimony.

 ¶ 38. We specifically do not affirm on the primary ground for the trial court decision. We have stated that "[i]n some cases, both the trial court and this Court can fully evaluate the reliability and relevance of the evidence generally based on the decisions of other appellate courts." *State v. Kinney*, 171 Vt. 239,

249, 762 A.2d 833, 841 (2000). We have made clear, however, that "[w]e are not suggesting that the new standard for admissibility has somehow become general acceptance among appellate courts. Irrespective of the decisions of other courts, the responsibility for determining the admissibility of evidence in Vermont courts remains with our trial judges, and on appeal with this Court." *Id.* Therefore, trial courts must take great care when relying on other court decisions to ensure that they do not abdicate their responsibility as evidentiary gatekeepers.

¶ 39. We conclude that this is not one of the cases in which the decisions of appellate courts can form the primary basis for a decision to exclude scientific evidence under V.R.E. 702. There is a significant split of authority on the admissibility of voice pattern analysis evidence. See McCarthy, *supra*, §§ 3-17 (collecting cases). While, as the trial court noted, some courts have excluded this evidence, others have allowed it. In *United States v. Franks*, 511 F.2d 25, 33 (6th Cir. 1975), the United States Court of Appeal for the Sixth Circuit using the *"Frye* test"[3] concluded that a trial court acted within its discretion in admitting the prosecution's voice print analysis evidence. Similarly, the Seventh Circuit Court of Appeals, also using the *Frye* test, held that it was not an abuse of discretion for a trial court to admit voice identification evidence offered by the government in *United States v. Smith*, 869 F.2d 348, 354 (7th Cir. 1989); see also *United States v. Williams*, 583 F.2d 1194, 1201 (2d Cir. 1978) (concluding spectrographic voice analysis evidence admissible); *United States v. Baller*, 519 F.2d 463, 467 (4th Cir. 1975) (finding no abuse of discretion in admitting voice print analysis evidence); *United States v. Maivia*,

---

[3] The *Frye* test, first enunciated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), is a predecessor to the *Daubert* analytical framework, and is still used in some state jurisdictions to determine whether to admit voice print analysis evidence. McCarthy, *supra*, § 2[a]. It requires a showing that the technique is generally accepted within the relevant scientific community. *Frye*, 293 F. at 1014. The test has been criticized for being both over- and under-inclusive in that it can exclude scientifically reliable evidence and admit scientifically unreliable evidence. *Coon*, 974 P.2d at 393-94. It has been displaced by the *Daubert* analysis in both the federal jurisdictions and our own. *USGen*, 2004 VT 90, ¶¶ 15, 18. We still find cases decided under the *Frye* test to be helpful, however, particularly where the courts allowed the admission of the expert testimony. As we recently observed in *Daewoo*, *Daubert* liberalized the admission standard so that it "broadened the types of expert opinion evidence that could be considered by the jury at trial." 2008 VT 14, ¶ 9. Thus, there is a significant likelihood that if expert evidence is admissible under *Frye*, it is also admissible under *Daubert*.

728 F. Supp. 1471, 1478 (D. Haw. 1990) (denying government's motion to exclude testimony regarding spectrographic voice analysis); *Coon*, 974 P.2d at 402 (holding trial court did not err in admitting spectrographic voice evidence); *State v. Williams*, 388 A.2d 500, 505 (Me. 1978) (finding it was not error for trial court to allow expert voice identification evidence); *People v. Hubbard*, 738 N.W.2d 769, 769-70 (Mich. 2007) (Markman, J., concurring) (stating that court should revisit conclusion in earlier case that voice print evidence is inadmissible on the basis that several other states have authorized admission of such evidence); *State v. Williams*, 446 N.E.2d 444, 448 (Ohio 1983) (holding that in view of unrebutted evidence of reliability, it was not error for trial court to admit expert voice identification testimony); *State v. Wheeler*, 496 A.2d 1382, 1389 (R.I. 1985) (finding trial court properly admitted evidence of voice identification). We do not cite these decisions to say that we would necessarily follow them, but to emphasize the split of authority on the issue and the need for an adequate record to make an informed decision.

¶ 40. The limited use of reported decisions is demonstrated by the three decisions used by the trial court in this case. For instance, in *State v. Coon* the trial court found that each of the *Daubert* factors supported admission of voice spectrographic evidence and held that the trial court did *not* err in admitting the evidence. 974 P.2d at 402. Although the court concluded that it was unclear whether such evidence had attained general acceptance within the relevant scientific community, it found that the balance of the *Daubert* factors supported the decision to admit the evidence. See *id.*

¶ 41. The trial court's reliance on *Collins* is also problematic. In *Collins*, the New York Supreme Court, Kings County, did exclude the proffered voice print analysis evidence on the grounds that it was unreliable. 405 N.Y.S.2d at 370. As the New York Court of Appeals has acknowledged, however, New York courts are currently split over the admissibility of voice pattern analysis evidence. See *People v. Jeter*, 600 N.E.2d 214, 216 (N.Y. 1992). For example, after the *Collins* decision, the New York Supreme Court, New York County, admitted evidence regarding voice spectrographic analysis in *People v. Bein*, 453 N.Y.S.2d 343, 348 (Sup. Ct. 1982). Therefore, relying on *Collins* in isolation gives an incomplete portrait of how voice print evidence is viewed by New York courts.

¶ 42. Finally, *Angleton* is a trial court decision that reached the same result as the trial court here. 269 F. Supp. 2d at 904-05. It did so, however, on an extensive record that is not present in this case. Thus, the prosecution in *Angleton* contested the admissibility of the voice identification analysis through an expert witness with extensive experience in this analysis. The court had before it the important studies of the reliability of voice identification analysis. The decision goes through a thorough analysis of the evidence before it in reaching the conclusion that the evidence is inadmissible.

¶ 43. We understand the frustration of the trial court when it receives a one-sided presentation in support of the admission of scientific evidence under V.R.E. 702, with an inadequate presentation of the reliability deficiencies in the evidence. Nevertheless, the court must make its decision on the record before it; it cannot borrow disputed evidence from another proceeding in another court to determine the admissibility of the evidence under Rule 702.

*Affirmed.*