NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 64

No. 23-AP-382

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Marshall Parker | September Term, 2024 |

Katherine A. Hayes, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Allison N. Fulcher of Martin, Delaney & Ricci Law Group, Barre, for Defendant-Appellant.


PRESENT: Reiber, C.J., Eaton, Cohen and Waples, JJ., and Dooley, J. (Ret.),
 Specially Assigned


¶ 1. **REIBER, C.J.** Defendant Marshall Parker appeals his convictions for aggravated sexual assault, 13 V.S.A. § 3253(a)(8), and lewd and lascivious conduct with a child, id. § 2602. First, defendant contends that the court's exclusion of evidence that the complainant—J.P., the son of defendant's girlfriend—was engaging in other "concerning behavior" at the time he first made the allegations denied defendant a fair trial and the right of confrontation. Second, he argues that the State made prejudicial statements during closing argument, including violating the "golden rule" prohibition on asking jurors to put themselves in the complainant's shoes. We conclude that the court properly excluded defendant's proffered evidence and that the State did not commit reversible error in closing argument. Accordingly, we affirm defendant's convictions.

## I. Factual Background

¶ 2.    The following background is taken from the trial court's orders and the appellate record.  Defendant was initially charged in April 2018 with (1) aggravated sexual assault of a child, 13 V.S.A. § 3253a(a)(8); (2) aggravated sexual assault, id. § 3253(a)(8); (3) lewd and lascivious conduct with a child, id. § 2602; (4) sexual assault, id. § 3252(a)(1); and (5) lewd and lascivious conduct, id. § 2601.  The State later dropped the final two charges because it could not locate the alleged victim, defendant's daughter B.P.  The remaining charges related to J.P.

¶ 3.    Defendant began dating J.P.'s mother when J.P. was about four or five years old—approximately 2011.  J.P. alleged that defendant began sexually abusing him not long thereafter and that the abuse continued intermittently until the start of 2018.  In January 2018, mother received a call from defendant telling her to "come get your [expletive] rotten children."  When she arrived home, she found evidence of a physical altercation, including a broken door and chair.  Mother left the home with the children and filed for a relief-from-abuse order against defendant.  From then on, defendant no longer lived with mother or the children.

¶ 4.    In March 2018, after defendant had moved out, J.P. and mother passed by defendant's truck while visiting Rutland.  Upon seeing the vehicle, J.P. soiled himself.[1]  Later that day, J.P. told mother for the first time that defendant had touched him inappropriately.  In the following months, J.P. offered further details to mother and to several school employees, alleging that defendant had on various occasions grabbed his genitals, penetrated his anus, and made physical threats against him to prevent him from telling others.  Defendant was arrested and charged based on J.P.'s allegations.

¶ 5.    Although J.P. was only eleven years old at the time he first made the allegations, he had a history of sexualized behavior, including possessing pornography.  In advance of his first

---

[1] J.P. has a history of encopresis, particularly when he is under stress.  Mother indicated that these issues had improved somewhat following defendant's departure from the home.

trial, defendant filed a motion with the court seeking an order prohibiting the State from introducing any allegations of J.P.'s sexualized conduct. Defendant argued that such evidence "should be impermissible under Vermont's Rape Shield Law as well as being unsupported by evidence of a connection to defendant." The State agreed, indicating that it would not offer any evidence of sexualized behavior by J.P. or "ask the jury to infer from any such evidence that J.P. was sexually abused by Defendant." The court granted defendant's motion to exclude the evidence.

¶ 6. However, at opening statement during defendant's first trial, defense counsel sought to use this information, stating, "[w]hat the State didn't tell you is that about five days before [J.P.] made that disclosure, [mother] had been so concerned about behavior that [J.P.] was engaged in, looking at porn, engaging in inappropriate actions." The State immediately objected, and the court excused the jury for a bench conference. Defendant argued that the evidence was relevant to explain "how [J.P.] would know about certain sexual acts," and he suggested that the court's order only excluded the admission of such evidence for the purpose of showing that defendant sexually assaulted J.P. The court ruled that any reference to J.P.'s viewing of pornography was prohibited by the Rape Shield Law, but it permitted defendant to ask mother whether she was "concerned or troubled about his behavior" in the days leading up to his first accusation against defendant without referencing any of his "specific behaviors." Defendant then questioned mother about whether J.P. "was engaging in behavior [she] found very concerning," and she indicated that he was. The jury ultimately acquitted defendant of the first count but was unable to reach a verdict as to counts two and three, and the court declared a mistrial.

¶ 7. The State sought a second trial, which was held in front of a different judge. Prior to the trial, defendant moved for a hearing under the Rape Shield Law, 13 V.S.A. § 3255, regarding the admissibility of documents showing that J.P. had downloaded pornographic images. Distinct from the first trial, defendant argued that this information "raise[d] serious issues as to [J.P.'s]

3

knowledge of sexual acts despite his age, and a motive as to why he would accuse defendant of sexually assaulting him soon after he was caught downloading pornography." The State opposed the motion and asked the court to preclude "any references at trial to related matters, including the notion that [J.P] got in trouble for engaging in risky behavior." The State argued that the Rape Shield Law prohibited any reference to J.P.'s sexual conduct, including pornography, and that the attempt to avoid the prohibition by referring to "risky" behavior would cause the jury "to be confused and to speculate about this reference."

¶ 8. Following a hearing, the court denied defendant's motion, concluding that "evidence that J.P. may have obtained or used pornography would be evidence of sexual conduct and would therefore be barred under Section 3255." The court also rejected defendant's request that he be permitted to refer to J.P.'s "risky" or "concerning" behavior. The court found that "there is no evidence that viewing pornography is risky behavior, and there is no evidence that J.P. was 'in trouble' or being threatened with discipline of any kind as a result of this or any of his other more overtly sexual conduct." Accordingly, the court granted the State's motion to exclude all such evidence because it was "not probative at all" and any possible relevance "would be far outweighed by the likelihood that such evidence would simply confuse and mislead the jury."

¶ 9. Defendant's second trial began in April 2023. At the trial, the State elicited testimony from J.P. that he decided to come forward when he did "[b]ecause it felt like the right moment to tell, because at that time [defendant] was already in trouble for" the January 2018 altercation. Defendant responded by renewing his motion to allow reference to J.P.'s "concerning" behavior because the State had opened the door by offering its own explanation for the timing of the allegations. The court again denied the motion because there was no "nexus that's been demonstrated at any point in time between his disclosure [of the alleged sexual assault] and that conduct." The jury ultimately found defendant guilty on both remaining counts.

¶ 10. Defendant filed motions for a judgment of acquittal and for a new trial. In the latter motion, defendant renewed his argument that he should have been permitted to submit evidence that J.P.'s "concerning" behavior gave him a motive to falsely accuse defendant. He argued that refusing to allow the introduction of this evidence violated his constitutional right to confrontation. The court denied the motion, reiterating its earlier conclusion and stating that excluding this evidence did not deny defendant a fair trial. Defendant appealed.

## II. Discussion

¶ 11. Defendant challenges his convictions on two grounds. First, he argues that the court's evidentiary rulings violated his constitutional rights under the Due Process and Confrontation Clauses. And second, he argues that the State made prejudicial statements in its closing argument, including violating the "golden rule" by effectively asking the jurors to put themselves in J.P.'s place. Defendant asks that this Court reverse his convictions and remand for a new trial.

## A. Evidentiary Rulings

¶ 12. Defendant argues that he should have been permitted to question witnesses about J.P.'s "concerning behavior," particularly once the State presented a reason why J.P. disclosed the abuse at the time that he did. He concedes that any reference to the pornography would be prohibited under the Rape Shield Law, but he argues that references to "concerning behavior" are not prohibited and that this line of questioning was essential to his complete defense. He cites several of our cases that have recognized a defendant's right to confront a complaining witness about "the presence of an ulterior motive for . . . making the accusations." State v. Cartee, 161 Vt. 73, 76, 632 A.2d 1108, 1110 (1993); see State v. Memoli, 2011 VT 15, ¶ 24, 189 Vt. 237, 18 A.3d 567. Defendant argues that preventing him from "fully cross-examin[ing] J.P. and his mother

5

about what was going on just before his disclosure" denied him the ability to "present an alternative motive" for why J.P. accused him, in violation of the Confrontation Clause.[2]

¶ 13.   This Court ordinarily applies a "deferential standard of review to a trial court's evidentiary rulings." State v. Noyes, 2021 VT 50, ¶ 32, 215 Vt. 182, 260 A.3d 1132.  The party challenging the court's rulings bears the burden "to show that the trial court abused its discretion" and "[a]bsent such a showing, we will not disturb a reasonable discretionary ruling of the trial court, even if another court might have reached a different conclusion." State v. Herring, 2010 VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81 (quotation omitted).  However, in criminal cases, "the broad discretion of the trial court in evidentiary matters is limited by [the] defendant's constitutional right to confront witnesses against him and by the demands of due process." In re A.B., 170 Vt. 535, 536, 740 A.2d 367, 369 (1999) (mem.) (quotation omitted).

¶ 14.   The Confrontation Clause of the Sixth Amendment guarantees "the right of an accused in a criminal prosecution to be confronted with the witnesses against him." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quotation omitted); see U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").[3]   This includes "not only the right to cross-examine adverse witnesses, but also entitles a criminal defendant wide latitude on cross-examination for the purpose of showing who

---

[2]   In his briefs, defendant asserts violations of both the Due Process and Confrontation Clauses.  However, his substantive arguments focus only on the right to confront adverse witnesses, and his references to due process acknowledge the overlap in these rights. See, e.g., Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.").  Because the substance of defendant's claims is based in the right to confront witnesses, we have analyzed them solely under this rubric.

[3]   The Vermont Constitution similarly provides that "in all prosecutions for criminal offenses, a person hath a right . . . to be confronted with the witnesses." Vt. Const. ch. I, art. 10.  However, "[b]ecause defendant does not distinguish how our analysis under Article 10 of the Vermont Constitution should differ from an analysis under the U.S. Constitution's Confrontation Clause, we decline to interpret the State Constitution in this case." State v. Forty, 2009 VT 118, ¶ 23 n.2, 187 Vt. 79, 989 A.2d 509.

and what the witness is, and that he is unreliable, prejudiced, or biased." Herring, 2010 VT 106, ¶ 8 (quotation and alteration omitted). Nevertheless, the Clause is not boundless; "[i]t gives the defendant an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Forty, 2009 VT 118, ¶ 24 (quotation omitted). Importantly, "[t]he right of confrontation is not violated by the exclusion of evidence that is otherwise inadmissible." Herring, 2010 VT 106, ¶ 8.

¶ 15. We conclude that the trial court correctly excluded the proffered evidence as inadmissible and that defendant therefore has not made out a violation of the Confrontation or Due Process Clauses. As defendant concedes, any reference to J.P.'s possession of pornography is prohibited by the Rape Shield Law. Subject to three exceptions not relevant here, Vermont's Rape Shield Law excludes evidence of "prior sexual conduct of the complaining witness" in prosecutions for sexual assault and other related crimes. 13 V.S.A. § 3255(a)(3). "Sexual conduct" is defined to mean "any conduct or behavior relating to sexual activities of the complaining witness." Id. § 3251(2). Possessing and viewing pornography is "conduct or behavior relating to sexual activities" and is therefore covered by the Rape Shield Law.

¶ 16. Defendant cannot evade the Rape Shield Law by euphemistically referring to "concerning behavior" because such evidence is neither logically nor legally relevant. As we have recognized, the Confrontation Clause "applies only to evidence that is relevant and otherwise admissible under the rules of evidence." Forty, 2009 VT 118, ¶ 24. To meet the threshold to invoke the Confrontation Clause, defendant must show that the "evidence passes the tests of logical and then of legal relevancy." State v. Patnaude, 140 Vt. 361, 370, 438 A.2d 402, 405 (1981). Evidence is logically relevant if it has any tendency to make a fact that is "of consequence to the determination of the action" any "more probable or less probable than it would be without the evidence." V.R.E. 401. Evidence is legally relevant only if its probative value is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or

7

by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." V.R.E. 403.

¶ 17. First, we agree with the trial court that the proffered evidence is not logically relevant because defendant failed to present any evidence that J.P. was ever in trouble for possessing pornography. Defendant's theory of relevance is that J.P. had a motive to fabricate the allegations against defendant to distract attention from his being in trouble for his "concerning behavior."[4] But as the court found, "there is no evidence that J.P. was 'in trouble' or being threatened with discipline of any kind." To the contrary, when asked whether defendant was in trouble at the first trial, mother insisted that he was not. Defendant does not challenge the court's finding, nor does he point to any evidence in the record that J.P. was in trouble for possessing pornography. Relevant evidence must be "probative of the proposition for which it is offered" and must "in some degree advance[] the inquiry." State v. Raymond, 148 Vt. 617, 622, 538 A.2d 164, 167 (1987) (quotation omitted). Absent evidence of any causal link between J.P.'s "concerning behavior" and his coming forward with the allegations against defendant, the proffered evidence is irrelevant because there is no "connection or showing that it makes a material fact 'more probable or less probable than it would be without the evidence.' " State v. LeClaire, 2003 VT 4, ¶ 14, 175 Vt. 52, 819 A.2d 719 (quoting V.R.E. 401).

¶ 18. Second, even if the evidence was otherwise relevant, its probative value would be substantially outweighed by the likelihood of causing unfair prejudice and misleading the jury. As one appellate court stated under similar circumstances, "there is little obvious connection" between being "in trouble for possessing" pornography and making a false allegation of sexual assault.

---

[4] Defendant alternatively argued below that the evidence was relevant to show how J.P. had knowledge of sexual acts. However, as defendant concedes, the Rape Shield Law bars defendant from inquiring into J.P.'s sexual conduct. Absent the ability to inquire into the sexual nature of J.P.'s "concerning behavior," this evidence would not reveal any alternative basis for knowledge of sexual acts and is therefore not relevant for this purpose.

8

State v. Marks, 2011 UT App 262, ¶ 26, 262 P.3d 13, superseded by rule on other grounds as stated in State v. Steffen, 2020 UT App 95, ¶ 17 n.5, 468 P.3d 568. Nor does the proffered evidence "reveal an underlying hostility that would suggest an independent motive to accuse [defendant] falsely." Id. (quotation omitted). Further, by limiting defendant's ability to inquire into the specifics of J.P.'s sexual behavior, the Rape Shield Law operates to limit any probative value of the proffered evidence and increase the risks of prejudice and confusion. Oblique references to "concerning behavior" could confuse or mislead the jury about the underlying facts and could lead to unfair prejudice by causing the jury to make assumptions about J.P., impermissibly basing "its decision on something other than the established propositions in the case." State v. Amidon, 2018 VT 99, ¶ 21, 208 Vt. 360, 198 A.3d 27 (quotation omitted). We therefore conclude that even if the evidence had some minimal relevance, the court properly excluded it under Rule 403.

¶ 19. The cases cited by defendant do not change this conclusion. In Cartee, we concluded that evidence that the complainant's family had attempted to use the criminal prosecution as a bargaining chip to persuade the defendant to remain silent in a separate investigation of the complainant's stepfather's business was admissible to show a potential motive to fabricate the allegations. 161 Vt. at 77, 632 A.2d at 1111. We noted the defendant's detailed "offer of proof" as to these facts and concluded that the court abused its discretion in finding the evidence lacked probative value under Rule 403 because it was "not a matter of mere speculation." Id. at 74, 76, 632 A.2d at 1109-10 (quotation marks omitted). And in Memoli, we concluded that evidence of the complainant's drug use was admissible because it "directly related to whether [the] complainant voluntarily inhaled drugs and consented to sexual acts, both of which were the prominent disputes at trial." 2011 VT 15, ¶ 29. We noted that the proffered evidence "held strong probative value because it was critical for the defense to demonstrate to the jury why [the] complainant would consent to the described sexual acts, and why [the] complainant would afterwards lie about her consent." Id. ¶ 28.

9

¶ 20. These cases are plainly distinguishable based on the probative value of the proffered evidence and the effects of the Rape Shield Law. In both Cartee and Memoli, the defendants introduced evidence showing the chain of causation between the proffered evidence and the desired inference. Here, defendant never introduced any evidence that J.P. was in trouble for his "concerning behavior." Defendant therefore lacked a critical piece of the causal chain in his theory that J.P. had a motive to fabricate the allegations. Further, as discussed above, to the extent that the evidence here retains any independent probative value, the limitations imposed by the Rape Shield Law change the calculus under Rule 403 by limiting the probative value and exacerbating the risk of prejudice and confusion. Neither of the cited cases applied the Rape Shield Law,[5] which we have recognized involves evidence that is "unique among the varieties of past conduct with which the law customarily deals," given its "peculiarly private . . . character." Patnaude, 140 Vt. at 376, 438 A.2d at 408. As we recognized in Cartee, trial courts retain "wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." 161 Vt. at 77, 632 A.2d at 1111 (quotation omitted). This is precisely what the court did here, in line with its authority under Rules 401 and 403.

## B. Closing Arguments

¶ 21. Defendant next argues that the State made a series of "prejudicial and improper statements" at closing argument that deprived him of the right to a fair trial. He points to three comments the prosecutor made about the strength of the defense's arguments, referring to "the yarn that was just woven by defense counsel" and arguing that the defense "just doesn't add up" and "doesn't hold any water." Defendant also highlights the following statement:

---

[5] The trial court in Memoli did invoke the Rape Shield Law as one basis for its decision, but we rejected its applicability because the defendant was not seeking to introduce any evidence of the complainant's prior sexual conduct. 2011 VT 15, ¶ 20. The Rape Shield Law thus did not affect our analysis of the admissibility of the evidence under the Rules of Evidence.

> Say those words, and also acknowledge the difficult subject matter that you have been presented with over the course of the last two days. It's likely that a few of you encounter in your day-to-day lives the sexual abuse, the disruption in the family life, that you've heard about during this trial.
>
> And when you're deliberating, when you're thinking about this evidence, consider the fear, the shame, the embarrassment; those feelings of conflictive loyalty that [J.P.] was experiencing, and how him coming forward and saying what happened is among the bravest and the most difficult things that he ever had to do in his young life.

Defendant argues that this statement violated the "golden rule" by asking "the jury to put themselves in J.P.'s shoes when they deliberate." Defendant relies primarily on our decision in State v. Scales to argue that these statements showed a "studied purpose to arouse the prejudices of the jury," requiring reversal. 2017 VT 6, ¶ 30, 204 Vt. 137, 164 A.3d 652 (quotation omitted).

¶ 22. Defendant concedes that he did not object to any of these statements during trial and that the issue is therefore not preserved for appellate review. "When an issue has been forfeited through a party's failure to raise it below . . . we may consider it only under the rubric of plain error." State v. Yoh, 2006 VT 49A, ¶ 36, 180 Vt. 317, 910 A.2d 853; see V.R.Cr.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). In arguing for reversal based on prosecutorial statements, "[t]o prove prejudice under the plain error standard . . . the defendant must show that the prosecutor's remarks were not merely improper, but that they probed the outer boundaries of impermissible conduct." State v. Bubar, 146 Vt. 398, 403, 505 A.2d 1197, 1201 (1985). Such comments must be "manifestly and egregiously improper before we will consider them under the plain-error doctrine." State v. Hughes, 158 Vt. 398, 401, 610 A.2d 559, 561 (1992) (quotation omitted); see also State v. Ayers, 148 Vt. 421, 426, 535 A.2d 330, 333 (1987) ("We have rarely found plain error in prosecutor's arguments to the jury even where we have condemned the argument.").

¶ 23. We first conclude that the prosecutor's statements impugning the strength of the defense's case do not rise to the level of plain error. Even where we have disapproved of such

11

statements, we have repeatedly refused to reverse a conviction absent a showing that the statements affected a defendant's substantial rights. For example, in State v. Francis, the prosecutor insinuated that the defense had " 'put up a big smoke screen' " and stated that " 'it must be very difficult to come up with a theory of defense' " given the strength of the State's case. 151 Vt. 296, 298, 561 A.2d 392, 393 (1989). We disapproved of the prosecutor's arguments, stating that the prosecutor was "dangerously close to promoting his personal belief to persuade the jury" and that "[l]abeling the defense summation as a 'smoke screen' mischaracterized what we find to be reasonable and relevant arguments." Id. at 300, 561 A.2d at 394. However, because the defendant did not challenge these statements at trial, our review was limited, and we concluded that the statements were "not so egregious as to rise to the level of plain error." Id. at 301, 561 A.2d at 395. Similarly, in Hughes, we concluded under plain-error review that the prosecutor's statements that "defense counsel 'was not missing a trick' in questioning the victim, 'had the victim coming and going and tied up right in circles[,]' and 'has her confused' " were not "manifestly or egregiously improper" such that they "impaired defendant's right to a fair trial." 158 Vt. at 402, 610 A.2d at 561 (brackets omitted). Finally, in Scales, we characterized the prosecutor's statement that the defense's arguments were mere " 'smoke and mirrors' " as "not proper," but we concluded that the statement "would not be grounds for reversal" on its own, even where defense counsel objected at trial. 2017 VT 6, ¶ 24.

¶ 24. While the statements here impugning the defense's case were similarly improper, they were not "manifestly or egregiously improper," Hughes, 158 Vt. at 402, 610 A.2d at 561, and did not "probe[] the outer boundaries of impermissible conduct," Bubar, 146 Vt. at 403, 505 A.2d at 1201. Defendant points to no similar case where we have required a new trial based on such statements, nor does he identify any harm resulting from the statements. As in our previous cases, we conclude that "when viewed within the context of the trial as a whole, including the substantial

evidence of the defendant's guilt, it cannot be said that the remarks were so prejudicial to the defendant's interests as to require reversal." Id. at 404, 505 A.2d at 1201.

¶ 25. Finally, we conclude that the prosecutor's statements did not violate the golden rule. In Scales, we described a "golden rule argument" as one that "asks jurors to place themselves in the position of a party" and characterized such an argument as being "universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence." 2017 VT 6, ¶ 28 (quotation omitted). The prosecution in that case "ask[ed] the jurors to put themselves in the place of the child complainant" by stating:

> As adults, no one would want to ever come into court . . . and say, okay, I'm going to talk now about my first sexual experience. . . . Imagine how difficult it would be for an adult, and then put yourself in the eyes of [a] twelve[-]year-old child, and how difficult and challenging it would have been for her, and for her to come here, as well.

Id. ¶ 26. We concluded that this statement warranted reversal of the defendant's conviction because it showed "a studied purpose to arouse the prejudices of the jury." Id. ¶ 30 (quotation omitted).

¶ 26. While defendant urges us to follow Scales, the facts here are more analogous to our decision in State v. Bellanger, 2018 VT 13, 206 Vt. 489, 183 A.3d 550. The prosecutor in that case made two suspect statements. First, commenting on the child complainant's demeanor, the prosecutor said, " 'think about—most people can remember being in fifth grade, or fourth grade, having to do your very first oral report, how incredibly stressful that is. Most people remember it.' " Id. ¶ 42. And later, referring to the complainant's description of sexual contact, the prosecutor stated, " '[t]hat's exactly how you would describe it if you were trying to figure it out and you're eleven years old.' " Id. We distinguished these statements from those we disapproved of in Scales because "the statements that [the] defendant challenges as a golden rule violation do

not overtly invite jurors to place themselves in the victim's position." Id. ¶ 44. Rather, "when considered within the context of the prosecutor's surrounding argument," the statements were better understood as "an invitation to jurors to think about how difficult it was for [the complainant] to testify." Id. Because this speaks to the complainant's credibility rather than inviting jurors to place themselves in the complainant's position, the statements did not violate the golden rule. Id.; see also Bubar, 146 Vt. at 403-04, 505 A.2d at 1200-01 (concluding that asking jury if it had " 'given any thought to how difficult it was for [the complainant] to sit up here and do what she did' " was "a permissible argument as to credibility" and did not violate the golden rule because it did not ask the jury to "put themselves in the victim's place").

¶ 27.    The same is true here. Unlike the invitation in Scales to "put yourself in the eyes of [a] twelve[-]year-old child," 2017 VT 6, ¶ 26, the prosecutor here merely asked the jury to "consider the fear, the shame, the embarrassment" and the "feelings of conflictive loyalty that [J.P.] was experiencing." The prosecutor did not ask the jurors to place themselves in J.P.'s shoes; rather, he highlighted the difficult circumstances that J.P. faced in coming forward and used that context to argue that his testimony should be viewed as credible. Following the quoted statement, the prosecutor dedicated the next several pages of the recorded transcript to discussing J.P.'s testimony and the reasons why the jury should credit that testimony. Unlike Scales and other cases where we have found reversible error in prosecutorial statements, there is no evidence of a "studied purpose to arouse the prejudices of the jury." Id. ¶ 30. Rather, "when considered within the context of the prosecutor's surrounding argument," Bellanger, 2018 VT 13, ¶ 44, the function of the challenged statements to support J.P.'s credibility is clear.[6]

---

[6] Our conclusion should not be read to encourage the statements made by the prosecutor during closing argument. We merely hold that under the facts of the case and the applicable standard of review, the statements do not show an intent to arouse the prejudices of the jury and therefore do not amount to reversible error.

## III. Conclusion

¶ 28. For the reasons discussed above, we reject defendant's challenges to his convictions. First, the trial court did not err in excluding reference to J.P.'s "concerning behavior" because the evidence was not relevant, and to the extent it had any probative value, it was substantially outweighed by the likelihood to mislead the jury and cause undue prejudice. Second, the prosecutor's statements during closing argument did not violate the golden rule and do not amount to plain error that would require reversal of defendant's convictions. Accordingly, we affirm.

Affirmed.

FOR THE COURT:

_____

Chief Justice

15